T.C. Memo. 2002-231

UNITED STATES TAX COURT

MICHAEL A. MCGRATH AND FRANCES Y. MCGRATH, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 126-99.                    Filed September 18, 2002.


      In 1995, Ps leased (as lessee) retail space in a
shopping center to operate a bakery.  When Ps entered into
the lease, the leased space was nothing more than a dirt
floor enclosed by temporary walls; the leased space was not
serviced by any utilities.  The lease obligated Ps to make
substantial permanent improvements to the leased space at
their own expense.  Other than trade fixtures, the permanent
improvements Ps made to the leased space became the property
of the lessor upon installation.

      Ps did not make a sec. 179, I.R.C. 1986, election on
their timely filed tax return for either 1995 or 1996.  Ps
did not file a timely amended tax return for either 1995 or
1996.

      1.  <u>Held</u>: Ps' expenditures for the permanent
improvements they made to the leased space constitute
capital expenditures that are not currently deductible.
Sec. 263, I.R.C. 1986.  Ps' cost recovery for the years in

issue is by way of depreciation, as allowed in the notice of deficiency.

2. _Held_, _further_, Ps may not now elect to expense any sec. 179 property they placed in service in either 1995 or 1996, because the period for making valid sec. 179 elections for the years in issue has expired. Sec. 179(c), I.R.C. 1986.


Michael A. McGrath and Frances Y. McGrath, pro sese.

Emile L. Hebert III, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

CHABOT, _Judge_: Respondent determined deficiencies in individual income tax against petitioners as follows:

| Year | Deficiency |
|------|------------|
| 1995 | $28,590 |
| 1996 | 3,026 |

After concessions by both sides, the issues for decision[1] are as follows:

(1) Whether petitioners may deduct under section 162[2] the costs they incurred in 1995 in making permanent

---

[1] The following adjustments are computational, i.e., they depend on resolution of the issues for decision: (1) Earned income credit for 1996, and (2) itemized deductions for 1995 and 1996.

[2] Unless indicated otherwise, all section and chapter references are to sections and chapters of the Internal Revenue Code of 1986 as in effect for the years in issue.

improvements to property they leased (as "tenant") to operate a bakery.

(2) Whether petitioners may elect to expense section 179 property they placed in service in 1995 and 1996.

FINDINGS OF FACT

Some of the facts have been stipulated; the stipulations and the stipulated exhibits are incorporated herein by this reference.

Petitioners, Michael A. McGrath (hereinafter sometimes referred to as Michael) and Frances Y. McGrath, resided in Slidell, Louisiana, when they filed the petition in the instant case.

In 1995 petitioners executed three agreements relevant to the instant case: (1) A lease (hereinafter sometimes referred to as the Lease), (2) a T.J. Cinnamons Unit Franchise Agreement (hereinafter sometimes referred to as the Franchise Agreement), and (3) a Standard Form of Agreement Between Owner and Contractor (hereinafter sometimes referred to as the Construction Contract).[3]

---

[3] So stipulated. Both the Franchise Agreement and the Construction Contract show only Michael's name and signature, while the Lease shows the names and signatures of both petitioners. The Schedule C, Profit or Loss From Business, on petitioners' 1995 tax return shows only Michael as proprietor, while the 1996 tax return Schedule C shows both petitioners as proprietor. The parties do not appear to believe that any issue in the instant case is affected by whether the business was owned solely by Michael or was owned jointly by both petitioners.

A. <u>The Lease</u>

On or about August 21, 1995, petitioners, as "tenant", entered into the Lease with TUP 130 Company Limited Partnership, a Kentucky limited partnership (hereinafter sometimes referred to as TUP 130), as "landlord". Under the Lease, TUP 130 agreed to lease to petitioners space number 115 at the Mall at Barnes Crossing shopping center in Tupelo, Mississippi, for a 5-year term. (This space is hereinafter sometimes referred to as the Store Space.) Petitioners leased the Store Space in order to operate a T.J. Cinnamons franchised bakery, hereinafter sometimes referred to as the Bakery. The Bakery was to engage in the retail sale of cinnamon rolls, gourmet coffee, muffins, bagels, coffee cakes, and other related items incidental to a typical T.J. Cinnamons menu.

When petitioners entered into the Lease, the Store Space had a dirt floor, no utilities, and no permanent walls. The Lease obligated petitioners to complete construction of the Store Space at their own expense before they could occupy the space for the Bakery. The construction that petitioners were obligated to complete was as follows: (1) Excavation of the Store Space; (2) installation of a concrete slab floor and a floor covering therefor; (3) installation of a ceiling system; (4) installation of a return air plenum; (5) installation of partition walls; (6) installation of doors, frames, and hardware therefor; (7)

installation of a storefront, entrance doors, entrance grille bulkhead, entrance vestibule finish, show window platforms, show window, and vestibule ceilings, show window background and sign background; (8) installation of a fire sprinkler system; (9) installation of all electrical conduits and equipment required for a complete electrical installation; (10) installation of an extension of gas service from a metering point to the Store Space; (11) installation of ventilation or air purification systems; (12) installation of toilet room fixtures; (13) installation of all store fixtures; (14) installation of all required safety and emergency equipment; (15) installation of all required equipment for aiding the handicapped; (16) installation of insulation and interior finish on the exterior walls of the Store Space; (17) painting; and (18) wallpapering; the foregoing are hereinafter sometimes collectively referred to as the Improvements.

Under the Lease, petitioners were to remain the owners of (1) the trade fixtures they installed and (2) their merchandise; however,

> The storefront, partitions, heating and cooling equipment and all other permanent installations attached to the * * * [Store Space] shall become a part of the real estate, shall belong to * * * [TUP 130] at the moment of installation and shall be unencumbered by * * * [petitioners].

The term of the Lease was 5 years. The fixed minimum rent for the store space was $26,312 per year, payable in equal

installments and due on the first day of each month at the rate of $2,192.67 per month. Petitioners were not obligated to pay the fixed minimum rent until 6 months after the day the Bakery was first opened for business to the public.

In addition to their obligation to pay the fixed minimum rent, petitioners were also obligated to pay to TUP 130 various other charges such as real estate taxes (estimated as $276.47 per month), common area (estimated as $476.67 per month), insurance (estimated as $10.49 per month), water and sewer service ($16.80 per month), and merchants' association or marketing fund charges ($166.83 per month). These other charges totaled $947.26 per month. Other than the water and sewer charge, petitioners' obligation to pay these charges did not begin until 6 months after the day the Bakery was first opened for business to the public; petitioners' obligation to pay water and sewer charges did not include the 6-month delay language.

As a result, the Lease's 6-month delay language applied to a total of $3,123.13 per month ($2,192.67 fixed minimum, plus $947.26 other charges, less $16.80 water and sewer services), or $18,738.78 for the 6 months.

The Lease further obligated petitioners to maintain throughout the term thereof and at their own expense, (1) public liability insurance covering the store space and their use thereof, and (2) "fire and extended coverage" insurance.

Petitioners, TUP 130, and TUP 130's management company were to be insureds under the public liability policy. Petitioners were also responsible for paying all municipal, county, State, and Federal taxes assessed against their leasehold interest, fixtures, furnishings, equipment, stock-in-trade, and other personal property of any kind owned, installed, and existing in the Store Space.

B. The Franchise Agreement

On August 23, 1995, petitioners and T.J. Cinnamons, Inc., executed the Franchise Agreement, authorizing petitioners to operate a T.J. Cinnamons franchised bakery at the Store Space. The initial term of the Franchise Agreement was 10 years. Pursuant to the Franchise Agreement, petitioners paid to T.J. Cinnamons, Inc., an initial franchise fee of $17,500. (Petitioners concede that the $17,500 franchise fee must be capitalized and amortized over a period of 15 years, as in the notice of deficiency.)

C. The Construction Contract

As of November 1, 1995, petitioners and Regional Development & Building Inc., executed the Construction Contract for the Improvements. Petitioners performed the construction required under the Lease during the period from September through December 1995.

Petitioners incurred and paid expenditures for work on and for the Store Space during 1995 as shown in table 1.

Table 1

| | Payee | Amount |
|---|---|---|
| (1) | Gaffney Cabinets | $1,800 |
| (2) | Taylor Cabinet Shop (cabinet with counter) | 7,267 |
| (3) | Sign Craft | 428 |
| (4) | Tull Brothers | 240 |
| (5) | Mid-South Signs | 3,935 |
| (6) | Chroma Copy | 1,719 |
| (7) | Duncan Signs | 483 |
| (8) | Taylor Cabinet Shop (door frames & baseboards) | 13,500 |
| (9) | Corinth Carpets | 3,509 |
| (10) | Universal Manufacturing | 1,150 |
| (11) | Regional | 90,630 |
| (12) | Sherwin Williams | 406 |
| (13) | Joey Wilhite | 2,000 |
| | Total | 127,067 |

Items 1 through 7 in table 1, supra (totaling $15,872), were paid for furniture, fixtures, and equipment for the Bakery, and not for leasehold improvements. (The parties agree that these expenditures must be capitalized and depreciated under the modified accelerated cost recovery system (hereinafter sometimes

referred to as MACRS) as 7-year property, using the 200-percent declining balance method and the midquarter convention.)[4]

The remaining $111,195 ($127,067 less $15,872) of expenditures that petitioners paid for construction work on the Store Space was for the (1) excavation of the site, (2) installation of a concrete floor slab and floor coverings therefor, (3) installation of electrical service and fixtures, (4) installation of plumbing service and fixtures, (5) construction, painting, and wallpapering of permanent walls and partitions, and (6) installation of windows and doors. All of the $111,195 of expenditures that petitioners paid were for the performance of the Improvements as set forth in the Lease.

Of the remaining $111,195, $18,739 were payments made in lieu of the monthly payments due under the Lease for the 6-month period December 1995 through May 1996. See supra A. Lease, listing of 6-month delay items. The parties disagree as to the

---

[4] In 1995, petitioners bought $42,855 of equipment for the Bakery, in addition to the $15,872 discussed in the text. Some part of this $42,855 is in addition to the amounts dealt with in petitioners' 1995 tax return and respondent's notice of deficiency.

As we interpret the parties' stipulation, any part of the $42,855 that petitioners are not allowed to expense under sec. 179(a) (subject to the limitations of sec. 179(b)), discussed infra under II. Section 179 Election, shall be capitalized and depreciated under MACRS as 7-year property, using the 200-percent declining balance method and the midquarter convention.

As a result, a Rule 155 computation will be required regardless of how we rule on the issues for decision.

Unless indicated otherwise, all Rule references are to the Tax Court Rules of Practice and Procedure.

tax treatment of the remaining cost of the Improvements, $92,456 ($127,067 less $15,872 (furniture, fixtures, and equipment) and less $18,739 (payments made in lieu of rent)).

Also in 1995, petitioners (1) bought cash registers for the Bakery for $3,475, and (2) placed in service a computer (75-percent business usage) in which petitioners had a basis of $2,865. Petitioners classified the cash registers and the computer as 5-year property on their 1995 tax return and claimed depreciation deductions in respect thereof for 1995 and 1996 using the 200-percent declining balance method and the midquarter convention over a recovery period of 5 years. Respondent does not dispute either petitioners' classification of, or the amount of, claimed depreciation deductions, for either the cash registers or the computer.

In 1996, petitioners bought $5,059 of equipment for the Bakery.[5]

---

[5] So stipulated. As we interpret the parties' stipulation, any part of the $5,059 that petitioners are not allowed to expense under sec. 179(a) (subject to the limitations of sec. 179(b)), discussed _infra_ under II. Section 179 Election, shall be capitalized and depreciated under MACRS as 7-year property, using the 200-percent declining balance method and the midquarter convention.

However, in the notice of deficiency, respondent determined that on Dec. 30, 1996, petitioners placed in service equipment

(continued...)

Petitioners opened the Bakery in December 1995 and operated it until some time in February 1997. On or about April 7, 1997, petitioners sold the Bakery including the furniture, fixtures, equipment, inventory, and supplies therefor.[6]

D. 1995 Tax Return

Petitioners timely filed their joint 1995 income tax return. On this tax return they claimed a refund in the amount of $25,658. They did not elect on this tax return to treat any property they placed in service in 1995 as section 179 property, because they believed such an election would not affect the amount of the 1995 tax refund to which they were entitled.

E. 1996 Tax Return

Petitioners timely filed their joint 1996 income tax return. On this tax return they claimed a refund in the amount of $3,571, of which $3,026 was earned income credit. They did not elect on

_____

[5](...continued)
with a cost or other basis in the amount of $5,267. On opening brief, respondent notes this discrepancy and concludes that petitioners have conceded the $208 differential, but apparently only if petitioners lose on the sec. 179 issue. On answering brief, petitioners state that "In the respondent's opening brief, the respondent agrees that the petitioners purchased * * * $5,267 of Section 179 equipment in 1996."

The parties are to resolve this matter in the proceedings under Rule 155.

[6] The record does not show whether petitioners claimed as basis in determining their gain or loss on the 1997 sale any amount that they deducted on their 1995 or 1996 tax returns. The record also does not show what became of the Lease.

this tax return to treat any property they placed in service in 1996 as section 179 property.

_____

No more than $18,739 of petitioner's capital expenditures for the Improvements constitutes a substitute for rent.

OPINION

## I.  Deducting the Cost of Improvements

Petitioners contend that, under section 162(a)(3), they may deduct the cost of the Improvements because they (1) were required to pay for and make the Improvements, and (2) did not acquire either title to, or an equity interest in, the Improvements.  Petitioners' contention closely tracks the statutory language.  Petitioners' contention also appears to be based on assumed economic realities; i.e., that the Improvements that the lessee was required to make would increase the Store Space's value, that this expected value increase implicitly reduced the amount of the rent obligations, and that, to the extent of the reduction, the cost of the Improvements is deductible rent expense under section 162(a)(3).  Respondent contends that petitioners must capitalize and depreciate the cost of the Improvements because they are nondeductible capital expenditures under section 263.  We agree with respondent's conclusion and much of respondent's analysis.

In general, section 162(a)[7] authorizes current deductions for ordinary and necessary expenses of a trade or business. However, sections 161[8] and 261[9] have the effect of subordinating provisions such as section 162(a) to provisions such as section 263(a)(1),[10] thereby disallowing the current deductions of

---

[7] Sec. 162(a) provides, in pertinent part, as follows:

SEC. 162. TRADE OR BUSINESS EXPENSES.

   (a) In General.--There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including--

      (1) a reasonable allowance for salaries or other compensation for personal services actually rendered;

      (2) traveling expenses * * * while away from home in the pursuit of a trade or business; and

      (3) rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity.

[8] SEC. 161. ALLOWANCE OF DEDUCTIONS.

   In computing taxable income under section 63, there shall be allowed as deductions the items specified in this part, subject to the exceptions provided in part IX (sec. 261 and following, relating to items not deductible).

[9] SEC. 261. GENERAL RULE FOR DISALLOWANCE OF DEDUCTIONS.

   In computing taxable income no deduction shall in any case be allowed in respect of the items specified in this part.

[10] Sec. 263(a)(1) provides, in pertinent part, as follows:

(continued...)

capital expenditures that otherwise would have been currently deductible trade or business expenses. See, e.g., Commissioner v. Idaho Power Co., 418 U.S. 1 (1974). Unless some other special rules apply (see, e.g., the subparagraphs of sec. 263(a)(1)), the taxpayer's deductions for capital expenditures (if allowable at all) generally come by way of amortization or depreciation; i.e., the capital expenditure is deductible over a period of time. See, e.g., secs. 167, 168, and 169.

Ordinarily, depreciation or amortization is thought of as a deduction available to an owner of an asset with respect to that owner's basis in the asset. However, a lack of ownership is not determinative. We described the analysis in Currier v. Commissioner, 51 T.C. 488, 492 (1968), as follows:

> The allowance for depreciation is designed to permit the person who invests in a wasting asset a means of recouping, tax free, his investment in that property. To have the benefit of this deduction the taxpayer has the burden of proving that he has a depreciable interest in the property as to which he seeks a depreciation allowance. See Barnes v. United States, 222 F.Supp. 960 (D. Mass. 1963), affirmed sub nom. Buzzell v. United States, 326 F.2d 825 (C.A. 1, 1964), and the cases cited therein.

> Where the owner of real property enters into a long-term lease, under the terms of which the lessee is to

---

[10](...continued)
SEC. 263. CAPITAL EXPENDITURES.

    (a) General Rule.--No deduction shall be allowed for--

      (1) Any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate. * * *

construct at his own cost a building on the property, the lessee, not the lessor, is entitled to a deduction for the depreciation of the building.  See Reisinger v. Commissioner, 144 F.2d 475 (C.A. 2, 1944), affirming a Memorandum Opinion of this Court; Friend v. Commissioner, 119 F.2d 969 (C.A. 7, 1941), affirming a Memorandum Opinion of this Court; Commissioner v. Pearson, 188 F.2d 72 (C.A. 5, 1951), reversing and remanding on other grounds 13 T.C. 851; First Nat. Bank of Kansas City v. Nee, 190 F.2d 61 (C.A. 8, 1951); Goelet v. United States, 266 F.2d 881 (C.A. 2, 1959); Schubert v. Commissioner, 286 F.2d 573 (C.A. 4, 1961), affirming 33 T.C. 1048.

The lessee, who is obligated to make improvements to the realty, is entitled to recover his capital outlay by deductions for depreciation.  His right to the deductions is not altered by the fact that, under doctrines of local law, legal title to the improvements may reside in the lessor. In such situations it is the lessee, not the lessor, who suffers the economic loss as the property deteriorates, and who is entitled to the statutory allowance.  Helvering v. Lazarus & Co., 308 U.S. 252 (1939); First Nat. Bank of Kansas City v. Nee, supra.  The party claiming depreciation must have some investment in the wasting asset.  Detroit Edison Co. v. Commissioner, 319 U.S. 98 (1943).

To the same effect, see sec. 1.162-11(b), Income Tax Regs.[11]

---

[11]

Sec. 1.162-11.  Rentals.--

     *    *    *    *    *    *    *

(b) Improvements by lessee on lessor's property.--(1) The cost to a lessee of erecting buildings or making permanent improvements on property of which he is the lessee is a capital investment, and is not deductible as a business expense. * * *  [Emphasis added.]

The balance of this provision has been superseded by the enactment of sec. 168, in particular, sec. 168(i)(8)(A). However, the statutory language does not affect the continued validity of that part of the regulation set forth in this note. For an example of this continued validity, see Nelson v. Commissioner, T.C. Memo. 2000-212.

Applying the foregoing to the instant case, we conclude that (1) petitioners' expenditures dealt with in this issue are capital expenditures and (2) (unless some other provision or rule leads to a different result) petitioners' deductions on account of these expenditures are determined under sections 167 and 168, and not under section 162(a)(3).

There is a nonstatutory exception to the foregoing that applies to the instant case. Where a lessee makes a capital expenditure in lieu of some rent, then the expenditure will be treated as rent and not as a capital expenditure by the lessee. This exception's rationale is explained, and its application is illustrated, in Your Health Club, Inc. v. Commissioner, 4 T.C. 385, 389-390 (1944), as follows:

> The second question relates to the deductibility of rent in the amount of $4,250 in the fiscal year ended March 31, 1940. The facts show that petitioner had obligated itself to pay rental for that year in the amount of $4,250, but that a clause in the lease provided that petitioner might make certain improvements to the premises, the cost of which to the extent of $1,500 might be applied to the contractual rental. Petitioner expended $1,374.96 in making such improvements, applying this amount as a credit against the total rent due, and paid the lessor the difference, $2,875.04. The Commissioner determined that only the latter amount was deductible as rent and disallowed the deduction of the amount of $1,374.96, adding it to capital and making proper adjustment for amortization. Petitioner contends that the disallowed item was properly deductible as rent.

> Petitioner does not question the general rule that the cost borne by a lessee in making permanent improvements upon leased property is a capital expenditure, but contends that the outlay in this instance was no more than an indirect payment of a part of the stipulated rental, inasmuch as it was agreed that the cost of the improvements should be

applied as a credit against the rent for the current year. This appears to us to be a correct interpretation of the facts. Actually, petitioner paid nothing for the improvements; the cost thereof was borne by the lessor through the credit applied against the agreed rental. Consequently, petitioner has no capital investment to amortize or depreciate. The transaction is no different than if the lessor had paid directly for the improvements and the lessee directly paid the full agreed rent. On this issue, therefore, we hold that the determination of the Commissioner is erroneous.

In order for this exception to apply, the lessor and the lessee must intend that some or all of the lessee's capital expenditures are rent, and this intent must be plainly disclosed. In Cunningham v. Commissioner, 28 T.C. 670, 680 (1957), affd. 258 F.2d 231 (9th Cir. 1958), we described the situation as follows:

> In M.E. Blatt Co. v. United States, supra [305 U.S. 267, 277 (1938)], the Supreme Court has clearly stated that whether the value of such improvements constitutes rent depends upon the intention of the parties, and that even when the improvements are required by the terms of the lease this value will not be deemed rent unless the intention that it shall be such is plainly disclosed. Such intent in our opinion is to be derived not only from the terms of the lease but from the surrounding circumstances. This is recognized by the respondent in his published ruling I.T. 4009, 1950-1 C.B. 13.

To the same effect, see sec. 1.61-8(c), Income Tax Regs;[12] see also sec. 109.

The parties have stipulated that this exception applies to allow petitioners rent expense deductions of $3,123 for 1995 and $15,616 for 1996, for otherwise capital expenditures. This is founded on the parties' stipulation that "$18,739.00 of the expenditures * * * were in lieu of rental payments * * * to be made by petitioners over the six (6) month period of December, 1995 through May, 1996, inclusive." This latter part of the stipulation is, in turn, founded on the provisions of the Lease with regard to petitioners' rent obligations and construction obligations, as described <u>supra</u> in the Findings of Fact.

We now consider whether any amount in addition to the stipulated $18,739 was intended to be payments made in lieu of rent.

_____

[12] Sec. 1.61-8(c), Income Tax Regs., provides, in pertinent part, as follows:

Sec. 1.61-8  Rents and Royalties.--

      *    *    *    *    *    *    *

    (c) <u>Expenditures by lessee</u>. As a general rule, if a lessee pays any of the expenses of his lessor such payments are additional rental income of the lessor. If a lessee places improvements on real estate which constitute, in whole or in part, a substitute for rent, such improvements constitute rental income to the lessor. Whether or not improvements made by a lessee result in rental income to the lessor in a particular case depends upon the intention of the parties, which may be indicated either by the terms of the lease or by the surrounding circumstances. * * *

The Lease does not show that petitioners and TUP 130 intended to treat the entire cost of the Improvements as a rent substitute. The Lease contains provisions which give petitioners a rent holiday for the first 6 months after the day the Bakery was first opened for business to the public; these provisions underlie the parties' stipulation as to the $18,739. Beyond these provisions, however, the Lease is silent as to whether petitioners and TUP 130 intended to treat the remaining cost of the Improvements as a rent substitute.

The surrounding circumstances also do not show that petitioners and TUP 130 intended to treat the cost of the Improvements as a rent substitute beyond the 6-month rent holiday. Rather, petitioners' 1995 tax return, certain of petitioners' proposed findings of fact and statements on brief, and a portion of Michael's testimony belie petitioners' contention that they should be allowed to deduct the cost of the Improvements under section 162(a)(3) as rent expense.

Petitioners did not report any rent or lease expenses on the Schedule C attached to their 1995 tax return. Petitioners claimed a deduction of $103,388 for "repairs and maintenance" on the Schedule C attached to the 1995 tax return; the $103,388

deduction represented what petitioners thought was the cost of the improvements.[13]

On brief, petitioners proposed the following findings of fact:

8.  The petitioners were granted six months rent-free use of the retail space at The Mall at Barnes Crossing as a condition of Articles IV and V of their lease agreement in consideration for costs incurred by the petitioners in the build-out of the retail space. * * *

9.  The petitioners performed $127,067 of work on the retail space at The Mall at Barnes Crossing, and $18,739 of those expenditures were in lieu of rental payments to be made equally over a six month period by the petitioners.  Those rental payments were for the period of December 1995 through May 1996.

On opening brief, petitioners state, in pertinent part, as follows:

The petitioners received, from their lessor, credit equal to 6 months rent as consideration for the permanent improvements made to the lessor's real property.  Upon the completion of the first 6 months of occupancy, the petitioners commenced paying full rent, with no additional consideration for the improvements made.

On answering brief, petitioners state, in pertinent part, as follows:

The petitioners received, from their lessor, credit equal to 6 months rent as consideration for the permanent improvements made to the lessor's real property.  Upon the completion of the first 6 months of occupancy, the petitioners commenced paying full rent on the improved property, as if the improvements had been paid for by the lessor, with no additional

---

[13]   The parties agree, and we have found, that the cost of the Improvements was $127,067, not $103,388.

consideration for the improvements made. At that point in time, with the exception of the 6 months rent credit, the lessor realized the full benefit of the improvements, while the petitioners realized none.

After Michael testified that he could not "get a competitive bid" for the Improvements because of the lack of a local contractor who could do the work, he testified:

> And it was important for us in the business to be established before the Christmas rush, so we agreed to go ahead and pay the amount over and above, knowing that we were only going to get consideration for the total of the $18,000 in rent credit.

> The additional amount, the additional $92,000, we just assumed that that was cost of obtaining the site and possessing the retail space.

The above-quoted portions of petitioners' opening and answering briefs and Michael's testimony show that petitioners did not intend to treat the entire cost of the Improvements as a rent substitute. The only consideration for the Improvements, in petitioners' own words, was a "credit equal to 6 months rent". Moreover, petitioners' statement on brief that they "commenced paying _full_ rent, with no additional consideration for the improvements made" (emphasis added) after the 6-month rent holiday ended undercuts any contention that the cost of the Improvements reduced their monthly rent obligations under the Lease after the rent holiday. Based on the foregoing, we conclude that petitioners did not intend to treat as a substitute for rent the cost of the Improvements beyond the $18,739 as stipulated.

The only evidence regarding TUP 130's intention is the Lease, which, as set forth above, manifests an intent consistent with petitioners'; namely, that only $18,739 of the cost of the Improvements is a rent substitute.

On the basis of the preponderance of the evidence, we conclude that the Improvements are a rent substitute to the extent of $18,739 only.

Section 162(a)(3) addresses more than just "rentals"; it also addresses "other payments". In light of Michael's testimony and petitioners' above-quoted statements on brief, it may be that petitioners implicitly contend that the cost of the Improvements is deductible under section 162(a)(3) as "other payments". We previously concluded that the Improvements are capital expenditures. Capital expenditures made for betterments and additions to leased premises do not fall within the phrase "other payments". <u>Duffy v. Central R.R.</u>, 268 U.S. 55, 64 (1925).[14]

---

[14] The statutory language being construed in <u>Duffy v. Central R.R.</u>, 268 U.S. 55, 61 (1925), was sec. 12(a) (First) of the Revenue Act of 1916, ch. 463, 39 Stat.767, which states, in pertinent part, as follows:

> First. All the ordinary and necessary expenses paid within the year in the maintenance and operation of its business and properties, including rentals or other payments required to be made as a condition to the continued use or possession of property to which the corporation has not taken or is not taking title, or in which it has no equity.

The Supreme Court analyzed the situation as follows (268 U.S. at 63-64):

(continued...)

Accordingly, the cost of the Improvements, to the extent it is not a rent substitute, is not deductible as "other payments". Petitioners' cost recovery is by way of depreciation, as allowed in the notice of deficiency.

In light of the foregoing, it is evident that petitioners must capitalize the cost of the Improvements under section 263 and depreciate them in accordance with sections 167 and 168 even though (1) the Lease required petitioners to make the Improvements at their own expense, and (2) petitioners did not hold title to, or otherwise acquire an equity interest therein.

Petitioners raise an additional contention to support their claim that they may deduct the cost of the Improvements. On opening brief, petitioners state, in pertinent part, as follows:

> IRC § 110 (a) states: "Gross income of a lessee does not include any amount received in cash (or treated as a rent reduction) by a lessee from a lessor - (1) under a short-term lease of retail space, and (2) for the purpose of such lessee's constructing or improving qualified long-term real property for use in such lessee's trade or business at such retail space". Clearly, it is the intent of the IRC to not include as

---

[14](...continued)
Expenditures, therefore, like those here involved, made [by the lessee] for betterments and additions to leased premises, cannot be deducted under the term "rentals", in the absence of circumstances fairly importing an exceptional meaning; and these we do not find in respect of the statute under review. Nor do such expenditures come within the phrase "or other payments", which was evidently meant to bring in payments ejusdem generis with "rentals," such as taxes, insurance, interest on mortgages, and the like, constituting liabilities of the lessor on account of the leased premises which the lessee has covenanted to pay.

income any credit a lessee receives from his lessor for permanent improvements to the lessor's property under a short-term lease.  It follows that the income expended by a lessee for permanent improvements to the lessor's property are deductible from the lessee's gross income.

Section 110[15] does not apply in the instant case.  Firstly, section 110 applies only to leases entered into after August 5, 1997.  Sec. 1213(e) of the Taxpayer Relief Act of 1997, Pub. L. 105-34, 111 Stat. 788, 1001.  The lease in the instant case was entered into on or about August 21, 1995.  Thus, section 110 does not apply in the instant case.

Secondly, even if the Lease were subject to section 110, it would not apply in the instant case given the nature of the parties' dispute.  Section 110 is an income exclusion provision. Respondent is not charging petitioners with income on account of any TUP 130 payment or the 6-month rent holiday that TUP 130

---

[15]  Sec. 110 provides, in pertinent part, as follows:

SEC. 110.  QUALIFIED LESSEE CONSTRUCTION ALLOWANCES FOR SHORT-TERM LEASES.

(a) In General.--Gross income of a lessee does not include any amount received in cash (or treated as a rent reduction) by a lessee from a lessor--

(1) under a short-term lease of retail space, and

(2) for the purpose of such lessee's constructing or improving qualified long-term real property for use in such lessee's trade or business at such retail space,

but only to the extent that such amount does not exceed the amount expended by the lessee for such construction or improvement.

granted to petitioners in respect of the Improvements petitioners made.

Thirdly, we have already concluded that there was not any rent reduction, apart from the 6-month rent holiday, and so the requirement imposed by the opening flush language of section 110(a) has been satisfied only to that extent in the instant case.

Petitioners' position is not advanced by their section 110 contention.

We hold for respondent on this issue.

## II.  Section 179 Election

Petitioners contend that if we sustain respondent's determination on the section 162 issue, which we have, then they will need to file amended tax returns.  Petitioners further contend that if amended tax returns are required, then petitioners must be allowed to make section 179 elections on such tax returns.  Petitioners explain that they did not make section 179 elections on their tax returns for 1995 and 1996, because "such election would have no effect on the amount of the refund due the petitioners, assuming the construction costs deducted were determined to be allowable."  In contending that they should now be allowed to make valid elections under section 179,

petitioners apparently now believe that section 179 elections will reduce their tax liabilities for the years in issue.[16]

Respondent contends that petitioners are not entitled to make section 179 elections for 1995 and 1996 because they failed to make section 179 elections on their tax returns for those years. We agree with respondent.

---

[16] It has been suggested that the limitation imposed by sec. 179(b)(3) might cause a sec. 179 election for either of the years in issue to not affect the amount of any deficiency. In the instant case, the Court has proceeded to decide the issue presented because it is within our jurisdiction, and neither side has formally contended that the sec. 179 election issue is moot. In future cases, we may consider requiring the appropriate party to demonstrate that the issue in dispute is not moot. See, e.g., Foster v. Commissioner, 80 T.C. 34, 236-237 (1983), affd. in part and vacated in part 756 F.2d 1430 (9th Cir. 1985).

Section 179(c)(1)[17] delegates to the Secretary the authority to prescribe by regulations the manner in which a taxpayer makes a valid election under section 179.  Section 1.179-5, Income Tax Regs., provides, in pertinent part, as follows:

Sec. 1.179-5. Time and manner of making election.--

(a) Election.  * * *  The election under section 179 and section 1.179-1 to claim a section 179 expense deduction for section 179 property shall be made on the taxpayer's first income tax return for the taxable year to which the election applies (whether or not the return is timely) or on an amended return filed within the time prescribed by law (including extensions) for filing the return for such taxable year.  * * *

As applied to the instant case, section 1.179-5, Income Tax Regs., precludes petitioners from making valid section 179

---

[17]    SEC. 179.    ELECTION TO EXPENSE CERTAIN DEPRECIABLE
                     BUSINESS ASSETS.

*    *    *    *    *    *    *

(c) Election.--

(1) In general.--An election under this section for any taxable year shall--

(A) specify the items of section 179 property to which the election applies and the portion of the cost of each of such items which is to be taken into account under subsection (a), and

(B) be made on the taxpayer's return of the tax imposed by this chapter [chapter 1 relating to normal taxes and surtaxes] for the taxable year.

Such election shall be made in such manner as the Secretary may by regulations prescribe.

elections for 1995 and 1996. Petitioners did not make a section 179 election on their tax return for either 1995 or 1996. Both of those tax returns were timely filed. The time for filing amended tax returns has long since expired. Under these circumstances, it is too late to make a valid section 179 election. LaPoint v. Commissioner, 94 T.C. 733, 735-736 (1990).

Apparently at the heart of petitioners' contention that respondent's audit has created the need to file amended returns on which they should be allowed to make valid section 179 elections for 1995 and 1996 are beliefs that (1) respondent's adjustments created a situation when an election under section 179 would "change the bottom line", and (2) preventing petitioners from making the elections would not be equitable.

We addressed a similar contention in Patton v. Commissioner, 116 T.C. 206, 211 (2001). The taxpayer in Patton classified and deducted the entire cost of certain items as "materials" or "supplies". Id. at 207, 210. The Commissioner determined, and the taxpayer did not dispute, that the items the taxpayer classified as "materials" or "supplies" were depreciable property. Id. at 210. The Commissioner also determined that the taxpayer failed to report $135,638 of gross receipts from the taxpayer's business. Id. at 207. If the taxpayer in Patton had been permitted to amend the prior section 179 election to have that election apply to the reclassified items, then the taxpayer

would have been able to offset part of the profit the Commissioner determined for the taxpayer's business. <u>Id.</u> at 208. We concluded in <u>Patton</u> that it was the taxpayer's misclassification of assets (and not the Commissioner's determinations) that created the need to "revoke (modify)" the taxpayer's section 179 election. <u>Id.</u> at 210. Consequently, we held in <u>Patton</u> that it was not an abuse of discretion for the Commissioner to refuse to allow the taxpayer to "revoke (modify)" his section 179 election. <u>Id.</u> at 211.

Although petitioners are asking to make rather than "revoke (modify)" a section 179 election, the reasons underlying our decision in <u>Patton</u> apply also to the instant case. Like the taxpayer in <u>Patton</u>, petitioners' perceived need to file section 179 elections stems from petitioners' misunderstanding of the proper tax treatment of particular items and the understatement of the amounts they paid for section 179 property during the years in issue. We shall not carve out an exception to the general requirements of section 1.179-5(a), Income Tax Regs., to permit petitioners to make an otherwise untimely section 179 election.

We hold for respondent on this issue.

In order to take account of respondent's concessions,

<u>Decision will entered</u>

<u>under Rule 155</u>.
